IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

ANGELA FLOYD,                               )
  14405 Farmington Creek Road        )          Case No. 8:24-cv-1789
  Accokeek, Maryland 20607,          )
                                   )
PRINCE FLOYD,                               )          DEMAND FOR JURY TRIAL
  14405 Farmington Creek Road        )
  Accokeek, Maryland 20607,          )
                                   )
     Plaintiffs,                  )
                                   )
     v.                          )
                                   )
PRINCE GEORGE'S COUNTY, MD,                 )
  1301 McCormick Drive, Suite 4100   )
  Largo, Maryland 20774,             )
                                   )
CALVERT MANOR CIVIC                         )
ASSOCIATION,                                )
  102 Captain Brendt Drive           )
  Accokeek, Maryland 20607,          )
                                   )
RICHARD WALLACE,                            )
  14600 Farmington Creek Road        )
  Accokeek, Maryland 20607,          )
                                   )
DIANE WALLACE,                              )
  14600 Farmington Creek Road        )
  Accokeek, Maryland 20607,          )
                                   )
MARIA FEMIA,                                )
  14408 Farmington Creek Road        )
  Accokeek, Maryland 20607,          )
                                   )
MARIANNE KLINK,                             )
  14303 Leonard Calvert Drive        )
  Accokeek, Maryland 20607,          )
                                   )
THOMAS CASSIDY,                             )
  200 Massachusetts Ave. NW, Suite 400  )
  Washington, DC 20001,              )
                                   )

STEPHEN RANNACHER,                          )
  c/o Prince George's County Office of Law  )
  1301 McCormick Drive, Suite 4100         )
  Largo, Maryland 20774,                   )
                                   )
     Defendants.                           )
_____ )

## COMPLAINT

Plaintiffs Angela Floyd ("Mrs. Floyd") and Prince Floyd ("Mr. Floyd"), for their

complaint against Defendants Prince George's County ("Defendant PGC"), Calvert Manor Civic

Association ("Defendant CMCA"), Richard Wallace ("Defendant R. Wallace"), Diane Wallace

("Defendant D. Wallace"), Maria Femia ("Defendant Femia"), Marianne Klink ("Defendant

Klink"), Thomas Cassidy ("Defendant Cassidy") and Stephen Rannacher, in his individual

capacity ("Defendant Rannacher"), alleges the following:

     1.     The Floyds were one the first Black families to reside in the Calvert Manor

neighborhood located in Accokeek, Maryland. Since moving into their residence in June 2020,

the Floyds have been the subjects of persistent acts of intimidation, discrimination, and hostility

by Defendants because they are successful Black professionals who live in one of the most

elegant homes in Calvert Manor.

     2.     In an effort to disparage and defame the Floyds, Defendants R. Wallace, D.

Wallace, Femia, Klink, and Cassidy (collectively referred to as the "CMCA Defendants") have

publicly referred to the Floyds as "criminals" and publicly claimed that the Floyds were

destroying the fabric of the Calvert Manor neighborhood.

     3.     Since June 2020, the CMCA Defendants have lodged more than 100 police

complaints against the Floyds. These defendants submit several complaints to the police each

time the Floyds host a private social gathering at their residence, which has resulted in the police

questioning the Floyds on more than 50 separate occasions. The same defendants have yet to submit a single complaint to the police when White residents of the community host similar private gatherings.

4.     Defendants' actions have deprived and continue to deprive the Floyds of their property rights and equal protection under the law, including the right to use and benefit from their property in the same manner as that afforded to White families residing within the Calvert Manor neighborhood.

5.     The Floyds bring this action to seek redress for the substantial harm they have suffered due to Defendants' persistent and egregious acts of racial discrimination and intimidation. The Floyds' claims arise under Sections 1981 and 1982 of the Civil Rights of 1866, 42 U.S.C. §§ 1981 and 1982, as amended, Section 1983 of the Ku Klux Klan Act of 1871, 42 U.S.C. § 1983, as amended, and the laws of the State of Maryland.

**JURISDICTION AND VENUE**

6.     The Court has jurisdiction over this action under 28 U.S.C. §§ 1331 and 1343(a) because this case involves questions of federal law and because the Floyds seek damages for violations of their civil rights.

7.     The Court has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367 because the claims form part of the same case or controversy under Article III of the United States Constitution. The state law claims share all common operative facts with the Floyds' federal law claims, and the parties are identical. Resolving the Floyds' federal and state claims in a single action serves the interests of judicial economy, convenience, consistency, and fairness to the parties.

8.      Venue is proper in this judicial district under 28 U.S.C. § 1391(b) because the Defendants are situated within this judicial district and a substantial part of the events or omissions giving rise to the Floyds' claims herein occurred within this judicial district.

## THE PARTIES

9.      Plaintiff Angela Floyd is a professional tax advisor, and she owns the property located at 14405 Farmington Creek Road, Accokeek, Maryland 20607 (the "Accokeek Residence"). Mrs. Floyd is African American, and she resides at the Accokeek Residence with her husband, Prince Floyd.

10.     Plaintiff Prince Floyd is a real estate consultant. Mr. Floyd is African American, and he resides at the Accokeek Residence with his wife, Angela Floyd.

11.     Defendant Prince George's County is a municipal corporation duly organized and existing under the laws of the State of Maryland. Defendant PGC's Charter provides that it shall be the named party in all actions and proceedings touching its rights, powers, properties, liabilities, and duties. The Nuisance Abatement Board ("NAB") is a Board of Defendant PGC comprised of seven individuals that hear complaints alleging certain premises situated within the County constitute a public nuisance. The Department of Permitting, Inspections and Enforcement ("DPIE") is an agency of Defendant PGC that is responsible for, among other things, the administration and enforcement of the County's building and zoning codes. The Police Department ("PGCPD") is an agency of Defendant PGC that is responsible for enforcing the law within the county. Defendant PGC is the proper party in suits against the NAB, DPIE and PGCPD.

12.     Defendant Calvert Manor Civic Association is a civic association duly organized and existing under the laws of the State of Maryland. Defendant CMCA is composed of 121

households located within the Calvert Manor neighborhood in Accokeek, Maryland, and it is governed by a four-member Board of Directors.

13.     Defendant Richard Wallace is a member of the Calvert Manor Civic Association. Defendant Wallace is married to Dianne Wallace, and he resides in Prince George's County, Maryland.

14.     Defendant Diane Wallace is a member of the Calvert Manor Civic Association, and she serves on its Board of Directors and serves as its Vice President. Defendant D. Wallace is married to Richard Wallace, and she resides in Prince George's County, Maryland.

15.     Defendant Maria Femia is a member of the Calvert Manor Civic Association, and she is actively involved with the civic association. Defendant Femia resides in Prince George's County, Maryland.

16.     Defendant Marianne Klink is a member of the Calvert Manor Civic Association, and she serves on its Board of Directors and serves as its Treasurer. Defendant Klink resides in Prince George's County, Maryland.

17.     Defendant Thomas Cassidy is a member of the Calvert Manor Civic Association. Defendant Cassidy resides in Prince George's County, Maryland.

18.     Defendant Stephen Rannacher is employed by the Prince George's County Police Department as a police officer. Upon information and belief, Defendant Rannacher resides in Prince George's County, Maryland.

## **Background**

19.     In or around June 2020, the Floyds began residing at their Accokeek Residence, which is situated within the Calvert Manor neighborhood in Accokeek, Maryland. At the time

the Floyds moved into the Accokeek Residence, they were the only African American couple living on waterfront property in the community.

20.     The Accokeek Residence sits on the Piscataway Creek and spans nearly two acres. The nearest house to the Accokeek Residence is at least 250 feet away.

21.     Defendant CMCA is a homeowners association that consists of 121 households situated within the Calvert Manor neighborhood. Defendant CMCA is governed by a four-member Board of Directors (the "CMCA Board"). Since at least June 2020, the following have served and continue to serve on the CMCA Board: (a) Collen Puterbaugh, who also serves as President; (b) Dianne Wallace, who also serves as Vice President; (c) Marianne Klink, who also serves as Treasurer (and former President); and (d) Lexi Sobiech, who also serves as Secretary. Each member serving on the CMCA Board is Caucasian.

22.     The Floyds are one of only two households within the Calvert Manor neighborhood that are not a part of the Calvert Manor Civic Association. The Floyds are eligible to be members of the Calvert Manor Civic Association.

23.     The Floyds have made repeated requests to the CMCA Board to become members of the Calvert Manor Civic Association, but each request has been denied by the CMCA Board. The CMCA Board has not denied membership to any other resident in the Calvert Manor neighborhood. The Floyds' racial identity is the only meaningful difference between them and the other residents who have been allowed to join Defendant CMCA.

### *Persistent Police Complaints by CMCA Defendants*

24.     From July 2020 through the present, Defendants R. Wallace, D. Wallace, Femia, Cassidy, and other members of the CMCA lodged dozens of complaints with the Prince George's County Police Department ("PGCPD") regarding the Floyds or activity occurring at

their Accokeek Residence. As a result, the PGCPD has dispatched officers to the Accokeek

Residence more than 50 times—on some occasions as early as 9:00 a.m.

26. Despite the high volume of persistent complaints made against the Floyds, the

PGCPD has never issued a citation, imposed a fine, or made an arrest in connection with any of

the complaints.

26. The CMCA Defendants filed most of the complaints against the Floyds, typically

claiming unlawful activity at the Floyds' Accokeek Residence. Each complaint made by a

CMCA Defendant was frivolous and intended to harass or intimidate the Floyds based on their

race or the racial identity of their guests. The CMCA Defendants have never provided any

documents or evidence to the Floyds or the PGCPD to substantiate claims of unlawful activity at

the Accokeek Residence or justify a response from law enforcement.

### *False Complaints by Defendants Femia & CMCA*

27. On or about June 23, 2021, Defendant Femia made a complaint to Defendant

Rannacher—a police officer employed by PGCPD—regarding noise and "illegal parking" at the

Accokeek Residence. Defendant Femia's statement regarding "illegal parking" was false or

made with a reckless disregard for the truth. At the time Defendant Femia made the statement,

there were not any parking restriction signs installed along the Floyds' property line that would

indicate parking was illegal in the area.

28. Shortly after Defendant Femia submitted her complaint to Defendant Rannacher,

the Treasurer for Defendant CMCA, Marianne Klink ("Ms. Klink"), sent an email to Defendant

Rannacher requesting information about the status of "inquiries of the owners of the property by

[PGCPD], and also […] assessment of ways to control [the] situation."

29.     In or around July 2021, Defendant CMCA issued a newsletter publicly complaining about the Floyds, stating that "[m]any neighbors called the non-emergency police number a few times this month as the noise level and parking […] was disruptive to many who live in the lower part of Calvert Manor." In its newsletter, Defendant CMCA referred to the Floyds as "disrespectful and inconsiderate." At the time the newsletter was distributed, Defendant Klink served as the President of Defendant CMCA.

30.     Defendant CMCA had never previously referred to other residents within the Calvert Manor neighborhood as "disrespectful and inconsiderate." The Floyds' racial identity is the only meaningful difference between them and the other residents within the Calvert Manor neighborhood.

31.     The newsletter disseminated by Defendant CMCA included a statement from the PGCPD, namely Corporal Victoria Blackwell and Defendant Rannacher, that noted their interest in "hearing from individuals who may have seen other questionable activity." The only "questionable activity" occurring at the Accokeek Residence was the occasional private social gathering to celebrate a birthday or other special occasion, which was ordinally attended largely by guests who identify as African American. At the time Defendant CMCA published the statement from the PGCPD, neither the PGCPD nor Defendant CMCA possessed any information that would support the inference that "questionable activity" had occurred or was occurring at the Floyds' Accokeek Residence.

32.     Defendant CMCA solicited and published the statement from the PGCPD for the sole purpose of harassing and intimidating the Floyds. Several other residents within the Calvert Manor neighborhood have hosted and continue to host private social gatherings at their residences without ever having the gatherings being characterized as "questionable activity" by

Defendant CMCA or the PGCPD. The Floyds' racial identity is the only meaningful difference between them and the other residents who have hosted private social gatherings in the Calvert Manor neighborhood.

33.     On July 5, 2021, Defendant Femia sent another email to Defendant Rannacher complaining about "people milling up and down the streets blocking the road" and about "two giant lights" being installed at the Accokeek Residence that lit up her "whole room." In her email, Defendant Femia admitted to calling 911 on the Floyds because of the "loud noise" coming from their Accokeek Residence, and that she was "actually contemplating moving because of the people next door." Defendant Femia was referring to the Floyds when she referenced "the people next door."

34.     In response to Defendant Femia's complaint, Defendant Rannacher advised her to call the County's non-emergency number rather than 911 whenever the Floyds were hosting "parties" at their Accokeek Residence. Defendant Rannacher's statement shows a deliberate indifference to the Floyds' rights to use and enjoy their Accokeek Residence on an equal basis with other residents in the Calvert Manor neighborhood.

35.     Defendant Femia did not make similar complaints to the PGCPD when other residents within the Calvert Manor neighborhood hosted private social gatherings or "parties." The Floyds' racial identity is the only meaningful difference between them and the other residents in the Calvert Manor neighborhood who live near or around Defendant Femia.

36.     On August 3, 2021, Defendant Femia contacted Defendant Rannacher again to complain about a flyer that allegedly advertised a party scheduled to occur within the Calvert Manor neighborhood, and she reiterated that the "community" made consistent calls to have "the party shut down." In her email, Defendant Femia pleaded with Defendant Rannacher to take

immediate action against the Floyds and the Accokeek Residence, specifically asking Defendant

Rannacher to "[p]lease help us this quiet community is being destroyed by this and people are

actually picking up and moving because of the noise."

37.     Defendant Rannacher knew that Defendant Femia was referring to the Floyds and

their Accokeek Residence. Prior to sending the complaint to Defendant Rannacher, Defendant

Femia did not possess any information that indicated the Floyds were responsible for the creation

of the flyer, or that the Floyds had anything to do with the event being advertised on the flyer.

Defendant Femia wrongfully associated the flyer with the Floyds and their Accokeek Residence.

38.     The Floyds did not create or cause the creation of the flyer that Defendant Femia

referenced in the email she sent to Defendant Rannacher, nor did the Floyds have any knowledge

of the flyer prior to learning about Defendant Femia's complaint to Defendant Rannacher.

39.     Defendant Femia's statement to Defendant Rannacher regarding people moving

"because of the noise" was false or made with a reckless disregard for the truth. Upon

information and belief, no one moved out of the Calvert Manor neighborhood in 2021 or 2022

due to noise associated with the Floyds' use or enjoyment of their Accokeek Residence.

Defendant Femia knew that no one had "picked up and moved" out of the Calvert Manor

neighborhood because of noise concerns. Defendant Femia made the false statement to

Defendant Rannacher in a malicious effort to persuade him and/or other officers with the

PGCPD to take enforcement actions against the Floyds, in a manner that interferes with the

Floyds' rights to use and enjoy their Accokeek Residence.

40.     On August 10, 2021, in response to Defendant Femia's complaint, Defendant

Rannacher informed her that the PGCPD had deployed a "Party Squad" to actively monitor the

Floyds and their Accokeek Residence. Defendant Rannacher further stated that "in the event

parties still continue [. . .] [the PGCPD] will place it on the nuisance abatement hearing board schedule." Defendant Rannacher did not have a legitimate basis to begin actively monitoring the Floyds and their Accokeek Residence, nor did Defendant Rannacher have a legitimate basis to involve DPIE in the Floyds' activities.

41.     Defendant Femia conspired with Defendant Rannacher to deprive the Floyds of their right to hold and maintain their Accokeek Residence on an equal basis with that of the White residents in the community.

### Wrongful Conduct by Defendants R. Wallace and D. Wallace

42.     Defendants Klink and D. Wallace, as President and Vice President of the CMCA, respectively, used their positions of authority within the Association to orchestrate and coordinate actions against the Floyds. Defendant D. Wallace regularly discussed the Floyds' activities with Defendant R. Wallace, who then acted upon these discussions to further their joint objective of harassing and intimidating the Floyds.

43.     Defendants Klink and D. Wallace used their influence within the CMCA to rally other board members and residents to file frivolous complaints against the Floyds. These coordinated efforts were communicated to Defendant R. Wallace, who actively participated in lodging and supporting these complaints.

44.     Defendants Klink and D. Wallace used their positions within the CMCA to access and distribute information about the Floyds' property and activities to Defendant R. Wallace and other members of the CMCA. This information was then used by Defendant R. Wallace and other members of the CMCA to file additional complaints and coordinate harassment efforts against the Floyds.

45.     On multiple occasions in 2021, 2022, and 2023, Defendant R. Wallace entered upon the Floyds' Accokeek Residence without permission despite the Floyds' repeated warnings for Defendant R. Wallace to stay off their property. Specifically, on June 20, 2021, June 21, 2021, July 19, 2022, July 20, 2022, June 10, 2023, and June 11, 2023, Defendant R. Wallace entered upon the Floyds' Accokeek Residence, approached Mr. Floyd, and made threats or insults towards Mr. Floyd concerning the Floyds' use or enjoyment of their Accokeek Residence.

46.     In June 2023, the Floyds obtained a peace order against Defendant R. Wallace after documenting multiple instances of his unauthorized entry onto their property, threats, and harassing behavior, which were intended to intimidate and disrupt their peaceful enjoyment of their home.

### The Pier Citation, Party Letter, and Installment of "No Parking" Signs

47.     On April 28, 2022, Gregory Hazzard ("Mr. Hazzard"), an Environmental Compliance Specialist with the Water and Science Administration of the Maryland Department of Environment ("WAS"), performed an inspection at the Floyds' Accokeek Residence because of "a complaint of pier replacement at the address noted was made to the Department." Upon information and belief, the complaint was made by one or more of the CMCA Defendants. Mr. Hazzard's inspection concluded that "[n]o violations were observed" and he recommended closing the complaint.

48.     On May 2, 2022, at approximately 11:16 a.m., DPIE Inspector Juan Swann delivered a citation to the Floyds, in the total amount of $4,000.00. The citation set forth the following alleged violation: "Pier replacement without a permit in the CBCA." The Floyds did not engage in any unpermitted activity on their pier. Attached hereto as Exhibit 1 is a true and correct copy of DPIE's citation.

49.     Shortly before DPIE Inspector Juan Swann delivered the citation to the Floyds, Defendant R. Wallace entered upon the Floyds' property without permission and asked Mr. Floyd for the information for the contractors repairing the Floyds' pier. Based on the short temporal period between Defendant R. Wallace's actions and the delivery of the citation, it is reasonable to infer that Defendant R. Wallace called DPIE and filed a false report against the Floyds that resulted in the unjustified citation.

50.     On or about May 5, 2022, a DPIE representative posted a notice to the Floyds' Accokeek Residence that listed several activities generally prohibited in residential neighborhoods under County law, such as events that involve admission fees and ticket sales. The notice further stated that "engaging in these types of activities may result in the county ordering the immediate closure of your event, issuing citations or violation notices to the homeowner . . . ." Attached hereto as Exhibit 2 is a true and correct copy of DPIE's Notice (hereinafter referred to as the "Party Letter").

51.     DPIE did not provide any evidence with the Party Letter that supports or corroborates that the Floyds held events at their Accokeek Residence that involved admission fees or ticket sales.

52.     Prior to receiving DPIE's Party Letter, the Floyds had never held an event that required an admission fee or involved ticket sales.

53.     DPIE issued the Party Letter to the Floyds at the request of one or more of the CMCA Defendants, in accordance with its official policies or customs. At the point DPIE posted the Party Letter to the Floyds' Accokeek Residence, the Agency did not possess any documentation that established the Floyds had engaged in any of the prohibited activities listed in the Party Letter. DPIE's actions reflect a deliberate indifference to the Floyds' right to use and

enjoy their Accokeek Residence on an equal basis with that of the other residents in the community.

54.     Prior to issuing the Party Letter to the Floyds, several other residents within the Calvert Manor neighborhood had held private social gatherings at their respective residences. The Floyds were the only household that received a Party Letter from DPIE warning them about engaging in prohibited activities on their property.

55.     On May 5, 2022, in an effort to identify the individuals who had been regularly filing complaints against the Floyds, Mrs. Floyd submitted a request to DPIE under the Maryland Public Information Act ("MPIA") for all records of complaints filed against their Accokeek Residence. To date, Mrs. Floyd has not received a response to the MPIA request.

56.     In or around August 2022, PGC's Department of Public Works and Transportation ("DPWT") installed "no parking" signs directly in front of the Floyds' Accokeek Residence. The Floyds sent an email to DPWT objecting to the installation of the "no parking" signs, specifically noting their concerns of racially-motivated actions being taken against them by members of Defendant CMCA.

57.     On September 2, 2022, the Acting Director of DPWT, Michael D. Johnson ("Mr. Johnson"), informed the Floyds that the "no parking" signs were installed in connection with a "customer service request." Upon information and belief, the customer service request was made by one or more of the CMCA Defendants or members of the CMCA Board. The CMCA Defendants and several members of the CMCA Board had previously complained about parking outside of the Floyds' Accokeek Residence.

58.     Despite the objections made by the Floyds, and the absence of documented evidence necessitating the installment of the signs, DPWT chose to comply with the "customer

service request" and installed the "no parking" signs alongside the Floyds' property line. At the time, DPWT had not installed parking restriction signs alongside the property lines of any other residence within the Calvert Manor neighborhood.

59.     DPWT's decision to install "no parking signs" alongside the Floyds' property line, based on a vague "customer service request," reflect a deliberate indifference to the Floyds' right to use and enjoy their property on an equal basis with that of the other residents within the community.

60.     From at least 2021 through November 2023, one of the Floyds' neighbors hosted several private gatherings at the neighbor's residence, including a Halloween party in October 2023 and a chili cookout in November 2023. During each social gathering held, the attendees parked along the street, partially blocking the street's egress and ingress routes. Neither of the CMCA Defendants, nor any other member of the Calvert Manor neighborhood, called the police to complain about the noise or parking issues caused by the party. The Floyds' race is the only meaningful difference between them and the neighbor who hosted the gatherings.

61.     The actions taken by DPWT, when viewed in conjunction with the frequent visits by PGCPD to the Floyds' Accokeek Residence, shows differential treatment towards the Floyds in comparison to the other residents of the Calvert Manor neighborhood who host private social gatherings or parties that result in guests parking alongside the street.

### *The Nuisance Complaint, "Freak Nik" Flyer, and Airbnb Complaint*

62.     On June 20, 2023, Defendant D. Wallace sent an email thanking Defendant Rannacher for meeting with members of the CMCA and confirming that she would be sending several files that document Defendant CMCA's issues with the Floyds.

63.     To date, the Floyds have never received any of the documents that Defendant D. Wallace provided to Defendant Rannacher that concern them or their Accokeek Residence.

64.     On June 22, 2023, the PGCPD submitted a Summary of Nuisance Complaint to the NAB. Defendant D. Wallace was listed as the complainant on the complaint, and Defendant Femia was listed as a witness. Attached hereto as Exhibit 3 is a true and correct copy of the Summary of Nuisance Complaint, dated June 22, 2023.

65.     The Summary of Nuisance Complaint alleged that the Floyds' Property constituted two separate Nuisances:

- Nuisance #1, dated June 10, 2023: On June 10, 2023 at 1700 hours Police responded to 14405 Farmington Creek Rd, Accokeek MD for a loud party complaint. [O]nce on scene officers spoke with a male claiming to be the home owner. Officers on scene claimed that there were multiple vehicles parked in the street where visible NO Parking signs are placed. Officers asked the home owner to have the vehicles moved and the owner became uncooperative but eventually had the vehicles moved and the music turned down. Neighbors said after Police left the area vehicle were brought back and music turned back up to loud causing a further disturbance.

- Nuisance #2, dated February 26, 2023: A history check of this residence at 14405 Farmington Creek Rd with a date range from June 20, 2020 to June 20, 2023, has a total of 11 Party complaints with officers responding out 41 times to shut down the parties. Party Notification letters were issued to the home owner at 14405 Farmington Creek Rd, Accokeek, MD 20607. The notification letter was served May 5, 2022.

The petition was not accompanied by an affidavit in support of the allegations therein, despite such affidavit being required under the Prince George's County Code of Ordinance § 14-172(b)(1).

66.     Upon information and belief, the PGCPD submitted the Summary Nuisance Complaint to the NAB pursuant to the instructions or requests of one or more of the CMCA Defendants.

67.     On July 4, 2023, Defendant Cassidy sent an email to Terrance Taylor, the District Director of the Office of Congressman Steny Hoyer. In the email, Defendant Cassidy asked Congressman Hoyer to assist with the "continuing problem" at the Accokeek Residence, and he claimed to represent "a group of homeowners in Prince George's County who have been besieged by a new neighbor who has been destroying the fabric of the quiet neighborhood near Calvert Manor." Defendant Cassidy further stated that a group of homeowners was "being bullied by the individual at [the Accokeek Residence]," and he alleged that there was a flyer for a "misogynistic event not suited for a 100 percent residential neighborhood." Attached hereto as Exhibit 4 is a true and correct copy of the email sent by Defendant Cassidy, dated July 4, 2023.

68.     Defendant Cassidy was referring to the Floyds in his communications with Congressman Hoyer's office, namely Mr. Floyd.

69.     In response, Mr. Taylor informed Mr. Cassidy that the matter fell under the County's noise ordinance, which was under Councilman Sydney J. Harrison's jurisdiction. Mr. Cassidy provided Mr. Taylor with the contact information for Councilman Sydney J. Harrison.

70.     On July 5, 2023, in response to Defendant Cassidy's email, the Chief of Staff for Councilman Sydney J. Harrison, Eric Bowman, forwarded the correspondence to the PGCPD, DPIE, and the Board of License Commissioners, and Mr. Bowman confirmed that the agencies would take the "appropriate action and follow-up."

71.     On July 5, 2023, after receiving Mr. Bowman's email, the Commander of District VII of the PGCPD, Jeffrey D. Mitchell, ordered his team to "take necessary enforcement action if necessary."

72.     Defendant Cassidy leveraged his political influence and connections to effectively weaponize the PGCPD and DPIE to further the acts of intimidation and harassment being carried

out against the Floyds by Defendants CMCA, R. Wallace, D. Wallace, Femia, Klink, and other residents of the Calvert Manor neighborhood.

73.     On July 6, 2023, DPIE Inspector Brandon Wright ("Inspector Wright"), visited the Accokeek Residence. Inspector Wright showed the Floyds a flyer for an event that was scheduled to occur on July 8, 2023, titled "DMV FREAK NIK 23". Attached hereto as Exhibit 5 is a true and correct copy of the flyer Inspector Wright presented to the Floyds (hereinafter referred to as the "Freak Nik Flyer").

74.     Inspector Wright accused the Floyds of creating and distributing the Freak Nik Flyer. The Floyds informed Mr. Wright that they did not create, distribute, or cause the creation or distribution of the Freak Nik Flyer. The Floyds further informed Mr. Wright that he Freak Nik Flyer had nothing to do with them or their property.

75.     Despite the Floyds' representations, Inspector Wright posted a summons issued by the NAB to the entrance gate of the Floyds' Accokeek Residence, together with a copy of the Freak Nik Flyer. Attached hereto as Exhibit 6 is a true and correct copy of the NAB summons, dated July 4, 2023.

76.     The NAB summons was addressed solely to Mrs. Floyd, and stated that Mrs. Floyd was facing "charges" of:

> A complaint regarding loud noise & music causing neighborhood disturbance, 11 loud noise & music complaints between June 2020 – June 2023, and continued non-compliance after multiple Party Notification Letters were issued at property address 14405 Farmington Creek Road, Accokeek, MD 20607 has been referred to the Nuisance Abatement Board of Prince Georges County, Maryland.

77.     Inspector Wright further informed the Floyds that he had previously visited their residence to deliver a citation because of a private social gathering that had occurred at the Accokeek Residence in the fall of 2022. Unbeknownst to Inspector Wright, the Floyds obtained a

special permit from the County to host the private social gathering. Attached hereto as Exhibit 7 is a true and correct copy of the Floyds' Special Permit issued by DPIE.

78.     The Floyds occasionally list their Accokeek Residence for rent on Airbnb. The CMCA Defendants know that the Floyds occasionally list their Accokeek Residence for rent on Airbnb.

79.     On July 7, 2023, the Community Support team for Airbnb informed Mrs. Floyd that the company had received a disturbance report on July 6, 2023, related to the Floyds' listing on the site. The Community Support team further confirmed that "[they] act only on the Neighbor disturbance a party or event may cause on the surrounding area." The message continued with:

> Here's what your neighbor shared with us: 'The host or their occupants are planning a massive party for this Saturday July 8th called freak nik! The [sic] are advertising on Facebook and other social media sites. They are advertising loud noise, drugs, alcohol, strippers and shuttle buses. This will bring so much noise traffic and disturbances to this very quiet peaceful neighborhood.'

80.     Upon information and belief, the complaint submitted to Airbnb was authored by one or more of the CMCA Defendants. The allegations in the Airbnb complaint closely resemble those contained in Defendant Cassidy's email to Representative Hoyer and in an email disseminated by the CMCA Board.

81.     The representations in the Airbnb complaint were false or made with a reckless disregard for the truth. The Floyds did not advertise a "massive party" for July 8, 2023 called "freak nik," nor were they advertising any event or party that involved drugs, alcohol, strippers, or shuttle buses. The complainant knew or should have known that their representations in the complaint to Airbnb were false. Prior to making the complaint, no one asked the Floyds about

the alleged "freak nik" event, nor was there any indication whatsoever that the event was connected with the Floyds.

82.     The complaint submitted to Airbnb further demonstrates an orchestrated effort on the part of the Defendants to wrongfully target and intimidate the Floyds. Other residents in Defendant CMCA frequently hosted private gatherings without any disturbance or interference from other neighbors, the PGCPD, or DPIE. The Floyds' racial identity is the only meaningful difference between them and the other residents in the Calvert Manor community.

83.     On July 8, 2023, Airbnb's Community Support team informed Mrs. Floyd that "[a]fter a careful review, [they] determined that [Mrs. Floyd's] listing have met [Airbnb's] Community Standards on Authenticity on this occasion." Attached hereto as Exhibit 8 is a true and correct copy of the email correspondence.

84.     Less than one week prior to receiving the Airbnb correspondence, Defendant CMCA circulated an update to Calvert Manor residence via email that contained a graphic of the Freak Nik Flyer. In the email, Defendant CMCA alleged that the event advertised on the flyer was scheduled to occur at the Floyds' Accokeek Residence. Defendant CMCA's allegation was false. The event advertised on the flyer had nothing to do with the Floyds or their Accokeek Residence. Defendant CMCA associated the flyer with the Floyds solely because the flyer depicted African Americans. Attached hereto as Exhibit 9 is a true and correct copy of the email correspondence disseminated by Defendant CMCA, dated July 1, 2023.

### The Nuisance Abatement Board Proceedings

85.     On October 19, 2023, the NAB conducted a public hearing based on the nuisance complaint submitted by Defendant D. Wallace. Defendant Rannacher represented the PGCPD at the hearing. During the hearing, Defendant Rannacher submitted evidence that confirmed the

PGCPD received 41 complaints between June 2020 and June 2023 concerning either the Floyds or activity occurring at their Accokeek Residence. Defendant Rannacher conceded that he was unsure whether the Floyds ever sold any tickets for events or gatherings that occurred at the Accokeek Residence.

86.     Defendant Rannacher confirmed that the Floyds had only received one party letter from DPIE prior to receiving the Nuisance Complaint. Defendant Rannacher acknowledged that the one party letter did not mention anything about: (a) threatening or assaulting any neighbors; (b) loud noises or loud music; or (c) illegal parking.

87.     Defendants R. Wallace, D. Wallace, and Femia provided testimonial evidence during the hearing. They each claimed that parties had occurred at the Floyds' Property that resulted in excessive noise. Neither witness provided any photographs, videos, or any other evidence to substantiate their claims.

88.     Mrs. Floyd testified that they had held intimate gatherings with friends and family at their Accokeek Residence, and she refuted the allegation that they had ever received any payments or funds in connection with the gatherings. Mrs. Floyd further testified that the Accokeek Residence has never been used as an event space, and that she had no idea who created or distributed the Freak Nik Flyer.

89.     Lachanda Wooten, a friend of Mrs. Floyd, testified that the Freak Nik Flyer was fabricated, and that she attended a separate family gathering at the Accokeek Residence on the same date that concluded that night.

90.     Ruth Contee, a former DPIE employee, testified that she attended gatherings at the Accokeek Residence, and that the noise levels were always reasonable.

91.     During the hearing, no evidence was presented by the PGCPD or DPIE that would lead a reasonable person to conclude that the Accokeek Residence was being used in a manner that: (a) endangered the life or health of persons in the immediate area; or (b) obstructed the quiet enjoyment and reasonable use of property by persons in the immediate area.

92.     At the hearing, no evidence was presented by the PGCPD or DPIE that would lead a reasonable person to conclude that the Floyds, while in or on their Accokeek Residence: (a) acted in a disorderly manner that disturbs the public peace; or (b) engaged in acts, or created or maintained conditions, that allows others to act in a disorderly manner that disturbs the public peace.

### *The NAB's Decision & Order*

93.     On November 3, 2023, the NAB issued a Decision ("Decision and Order"), that set forth the following finds of fact:

"1. Respondent is the owner of the [p]remises; 2. [l]oud noise & music[;] 3. 41 calls for service between June 2020-June 2023[; and] 4. [n]on-compliance with numerous party letters."

Attached hereto as Exhibit 10 is a true and correct copy of NAB's Decision and Order, dated November 3, 2023.

94.     Based on its findings of fact, the NAB made the following conclusions of law:

a)  "[Mrs. Floyd] is permitting the Premises to be used as a neighborhood nuisance as defined by §14-171(a)(2) of the Prince George's County Code because (a)acts in a disorderly manner that disturbs the public peace; (b)engages in acts, creates or maintains conditions that allows others to act in a disorderly manner that disturbs the public peace."

b)  "[Mrs. Floyd] is permitting the Premises to be used as a public nuisance as defined by §14-171(a)(7) of the Prince George's County Code because (E) [sic] [a]s a neighborhood nuisance as defined by this Section; (F) [sic] [t]o endanger life, health, or safety, or obstruct the quiet enjoyment and reasonable use of the property of persons in a particular area."

95.     The NAB's findings of fact are overly broad, vague, and fail to provide the Floyds with adequate notice of the specific grounds that support the NAB's conclusions of law.

96.     The NAB's findings of fact do not support the conclusion that Mrs. Floyd acted in a disorderly manner while on her Accokeek Residence that disturbed the public peace, or that she allowed others to act in a disorderly manner while on the property that disturbed the public peace.

97.     The NAB's findings of fact do not support the conclusion that the Accokeek Residence was being used to endanger the life or health of persons within the immediate area, or to obstruct the quiet enjoyment and reasonable use of property of persons within the immediate area.

98.     The NAB's findings of fact do not give rise to a public nuisance under Section 14-171(a). At best, the NAB's findings of fact show common violations of the County Code.

99.     The NAB's Decision and Order commanded Mrs. Floyd to "immediately discontinue any and all activities that constitute a nuisance," "discontinuance of the nuisance as follows: cease and desist all nuisance activities, comply with the no parking signs, and comply with community noise ordinance," and "pay a civil monetary fine of $1,000.00."

100.     The NAB routinely replicates the same legal conclusions verbatim in each of its rulings that support the positions taken by the County agencies. For example, attached hereto as Exhibit 11 is true and correct copy of the NAB's Decision and Order, dated May 10, 2023, entered against an African American business owner that replicates, verbatim, the same conclusions of law as reflected in Exhibit 10. The only difference appears to be that the drafter(s) of Exhibit 10 left the brackets when copying and pasting the text from one decision to another.

101.    The final decisions drafted by the NAB do not contain any information that informs Mrs. Floyd of her right to appeal the decision to the Circuit Court for Prince George's County, as set forth in Section 14-175 of the County Code.

102.    County agencies, including PGCPD, rely on the NAB's orders to shutter businesses and fine property owners throughout the County, including the Floyds. The misuse of the NAB highlights a systemic failure to uphold proper checks and balances within law enforcement practices, enabling arbitrary actions that infringe upon the rights of citizens within the County.

103.    The policies and practices followed by the NAB in receiving and deciding upon nuisance petitions pose a significant threat to the constitutional rights held by citizens across the County, namely those guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution, Article 24 of the Maryland Declaration of Rights, and Article III, § 40 of the Maryland Constitution,

### *Overview of Prince George's County Nuisance Abatement Board*

104.    On or about October 19, 1993, Defendant PGC created the Nuisance Abatement Board ("NAB") and established a civil administrative process for the abatement of nuisances where commercial property was being used for unlawful purposes that involved controlled dangerous substances. The NAB's power and authority is derived from Sections 14-170 through 14-175 of the Price George's County Code of Ordinances (hereinafter referred to as the "Nuisance Code").

105.    The NAB is charged with hearing complaints that allege certain premises situated within the County present a public nuisance, as defined by Section 14-171(a)(7) of the County Code.

106.    Since its inception, according to the Nuisance Code's legislative history, the NAB's scope has been expanded to address public nuisances in the County that arise from the continuing and recurrent use of certain commercial *and residential premises* that violated laws relating to controlled dangerous substances, prostitution, human trafficking, criminal gangs, storage of weapons, stolen property, contraband, or other evidence of criminal activity.

107.    Prior to 2015, Section 14-171(a)(7) of the County Code expressly defined a "public nuisance" as any residential or commercial premises used:

a)  By persons who assemble for the purpose of illegally administering a controlled dangerous substance, as defined in the Criminal Law Article of the Maryland Annotated Code;

b)  For the illegal manufacture or distribution of a controlled dangerous substance, or controlled paraphernalia, as defined in the Criminal Law Article of the Maryland Annotated Code; or

c)  For the illegal storage or concealment of a controlled dangerous substance in sufficient quantity to reasonably indicate under all the circumstances an intent to manufacture, distribute, or dispense a controlled dangerous substance or controlled paraphernalia;

d)  By persons for activities involving prostitution, human trafficking, or a criminal gang as defined in the Criminal Law Article of the Maryland Annotated Code;

e)  As a neighborhood nuisance as defined by this Section; or

f)  To endanger life or health, [sic] obstruct the quiet enjoyment and reasonable use of the property of persons in a particular area.

g)  For the storage or concealment of illegal weapons, stolen property, contraband or other evidence of criminal activity at the premises.

108.    In 2014, through the passage of CB-82-2014, the County Council amended Section 14-171(a)(7) to correct the typos in subsection (f) and to add a new subsection (H), which defined a public nuisance to include "a disorderly house as reference in the Criminal Law Article of the Maryland Annotated Code." The amendment became effective in 2015.

109.    Prior to 2015, Section 14-171(a)(2) of the County Code defined a "neighborhood nuisance" as "any premises . . . on or in which an owner, tenant or occupant of the premises: (a) acts in a disorderly manner that disturbs the public peace; or (b) engages in acts, creates, or

maintains conditions that allow others to act in a disorderly manner that disturbs the public peace."

110.    In 2014, through the passage of CB-82-2014, the County Council amended Section 14-171(a)(2) to require the occurrence of two or more separate qualifying incidents within a one-year period for a neighborhood nuisance, and to expand the definition of a neighborhood nuisance to include the following:

> (c) engages in activities that are prohibited in residential neighborhoods and zones, including any event, gathering, party, or picnic that involves: admission fees; cover charges; door charges; entry fees; ticket sales; food or beverage sales; adult entertainment charges, fees or sales; personal profit to the homeowner or organizer of an event; or is open to the general public.

The amendment became effective in 2015.

111.    The NAB consists of seven members, including one representative from DPIE, Prince George's County Police Department ("PGCPD"), and Prince George's County Fire Department ("PGCFD"). The other four members are appointed by the County Executive and approved by the County Council.

112.    In addition to the DPIE representative who serves on the NAB, a separate DPIE employee serves as the Administrator of the NAB, the duties of which include receiving nuisance petitions from persons and agencies within the County, handling the preparation of the NAB's meeting agendas, transcribing meeting minutes, and coordinating other administrative items related to the operations of the NAB.

113.    The current citizen members that serve on the NAB were last appointed by the County Executive and approved by the County Council in or around February 2022.

114.    None of the current members serving on the NAB have a law degree, nor do any have any specialized legal training in property law or administrative law.

115.    At the time the County Council approved the County Executive's nominations for the NAB, the Councilmembers and the County Executive knew or should have known that none of the nominees held a law degree or had specialized legal training in property law or administrative law.

116.    At the time the County Council approved the County Executive's nominations for the NAB, the Councilmembers and the County Executive knew or should have known that members of the NAB would be required to: (i) hear and receive evidence; (ii) weigh the credibility of witnesses and other evidence; (iii), make findings of fact; and (iv) render conclusions of law regarding whether a public nuisance exists on a specific property. The Councilmembers and the County Executive knew or should have known that, if a majority of the NAB members concluded that a public nuisance exists on a specific property, the NAB had the authority under the Nuisance Code to order the immediate closure of a business, or the premises on which it operates, for up to one year.

### County Attorney's Lack of Participation in the NAB Proceedings

117.    Prior to 2015, Section 14-172(b) of the County Code expressly granted the County Attorney the authority to "initiate proceedings under [the Nuisance Code] to abate and prevent [a] nuisance and [to] enjoin the person conducting or maintaining it . . . whenever any person or agency of the County provides sufficient evidence to support such proceedings." Under the Nuisance Code at this time, nuisance petitions prepared by any person or agency of the County were initially required to be reviewed by the County Attorney so that the County Attorney could make in independent determination as to whether sufficient evidence exists to commence proceedings to abate or prevent the alleged public nuisance.

118.    Prior to the initiation of proceedings to abate, prevent, or enjoin a nuisance, the prior version of the Nuisance Code required the County Attorney to submit a petition to the NAB that sets forth the basis for the County Attorney's belief that: (i) a public nuisance existed; and (ii) the owner, lessor, lessee, mortgagor, and mortgagee of the premises (the "Interested Person") had failed or refused to cooperate with the County's attempts to abate the nuisance. The Nuisance Code further required that any petition submitted by the County Attorney to the NAB be accompanied by an affidavit(s) in support of the allegations contained therein.

119.    Upon receiving a petition from the County Attorney, the prior version of the Nuisance Code required the NAB to review the petition and issue a notice of hearing if a majority of its members specifically determined that the County Attorney had sufficient evidence to support its case. Should the NAB determine that sufficient evidence exists, the Nuisance Code then required the NAB to give notice of the complaint to the Interested Person and afford the Interested Person an opportunity for a hearing to determine whether a public nuisance exists.

120.    At the public hearing, the prior version of the Nuisance Code required the County to prove, by a preponderance of the evidence, that: (i) a public nuisance exists at the premises; and (ii) the Interested Person has failed or refused to cooperate with the County's attempts to abate the nuisance.

121.    At the conclusion of a hearing, if five of the seven NAB members concur, the prior and current version of the Nuisance Code authorizes the NAB to, among other things: (1) order the discontinuance of the public nuisance in the premises where the public nuisance exists; and (2) order the closing of the premises to the extent necessary to abate the nuisance, and keep it closed for a period not to exceed one year.

122.    The Nuisance Code is silent on whether the NAB's deliberations on a matter must occur in open vs. a closed session. For the last several years, the NAB members have held their deliberations in private, non-public meetings. For the last several years, the NAB members have voted unanimously in favor of DPIE and other County agencies on more than 90% of the cases heard by the NAB.

123.    The NAB's civil administrative process changed significantly in 2015 when the County Council amended the NAB Ordinance through the passage of CB-82-2014. Beginning in 2015, the County Attorney was removed from the administrative process altogether, and proceedings before the NAB could now be initiated by a "municipal law enforcement agency, fire department, or any other County or municipal agency or department authorized to issue citations or corrective orders."

124.    By willfully removing the legal oversight and expertise provided by the County Attorney in the civil administrative process for the abatement of nuisance, the County Council recklessly disregarded a substantial risk of harm to County residents who were alleged to have violated the NAB Ordinance.

**HARM CAUSED**

125.    The Defendants have engaged, and continue to engage, in a pattern of improperly using County resources to harass and intimidate the Floyds due to their race and the racial identity of their guests. This conduct has deprived the Floyds of their right to feel safe and secure in their own home, as well as their right to use and enjoy their property, on an equal basis with White residents in the community.

126.    The persistent harassment and intimidation by the CMCA Defendants and their collaborators have made the Floyds feel unwelcome and unsafe in their community, while

profoundly impacting the Floyds' mental health and well-being. The constant fear of further retaliation and the stress of dealing with baseless accusations have taken a toll on their psychological health, causing the Floyds to have constant feelings of fear, anxiety, and insecurity in their own home.

127.    The emotional distress suffered by the Floyds has manifested in various ways, including loss of sleep, heightened anxiety levels, and a constant state of vigilance. The Floyds have had to alter their daily routines and activities to avoid potential confrontations and further harassment by the Defendants.

128.    The Defendants' actions have also caused substantial damage to the Floyds' reputation within their community. Being repeatedly referred to as "criminals" and subjected to false accusations has led to social ostracism and isolation. This has impacted their relationships with neighbors and other community members, further exacerbating their emotional distress.

129.    The wrongful conduct of the Defendants has resulted in economic harm to the Floyds. The targeted enforcement actions and fines have placed a financial burden on the Floyds, making it difficult for them to maintain their property and enjoy the benefits of homeownership on an equal basis with White residents in the community.

130.    The Defendants' actions have disrupted the Floyds' ability to enjoy their property peacefully. The frequent police visits, installation of "no parking" signs, and public disparagement have created an environment of hostility and tension, significantly impairing the Floyds' quality of life.

131.    The actions taken by the Defendants and their collaborators have also hindered the Floyds' ability to participate in community activities and decision-making processes. Being

excluded from the CMCA and facing unwarranted enforcement actions have deprived the Floyds of the full benefits and privileges of living in their neighborhood.

132.    As a result of the Defendants' wrongful conduct, the Floyds have suffered and continue to suffer substantial harm, including emotional distress, reputational damage, economic losses, and impairment of their ability to enjoy their property and participate in their community on an equal basis with other residents.

### COUNT I
**Violation of Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981,
By Defendants**

133.    The Floyds incorporate herein the allegations set forth in paragraphs 9 through 132, above.

134.    Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981, prohibits discrimination on the basis of race in the making and enforcement of contracts, which includes "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b).

135.    The Floyds are members of a protected class under 42 U.S.C. § 1981 based on their status as African Americans.

136.    At the time the CMCA Defendants engaged in the conduct at issue, each of the CMCA Defendants knew that the Floyds were Black or African American, or that the Floyds otherwise belonged to a racial minority group.

137.    The Floyds have contractual rights protected under Section 1981 that flow from their deed for the Accokeek Residence. The Floyds have prospective contractual rights protected under Section 1981 that flow from their requests to become members of the CMCA, which would create certain contractual relationships between the Floyds and the CMCA.

138.     Defendant R. Wallace engaged in conduct that interfered with the Floyds' rights under Section 1981 by, among other things: (a) persistently entering onto the Floyds' Accokeek Residence without permission to threaten or intimidate the Floyds; (b) calling the police to report the Floyds each time the Floyds held a private social gathering at their Accokeek Residence; (c) referring to the Floyds as "criminals" and disparaging them in communications with third parties, including other residents in the community; (d) claiming that the Floyds were engaging in unlawful activity at their Accokeek Residence in communications with third parties; and (e) conspiring with one or more of the other CMCA Defendants and representatives of DPIE and the PGCPD to target the Floyds with unjustified law enforcement and code enforcement actions.

139.     Defendant R. Wallace's conduct was premised on the Floyds' race. Defendant R. Wallace acted intentionally, and with malice, in interfering with the Floyds' rights under Section 1981.

140.     Defendant D. Wallace engaged in conduct that interfered with the Floyds' rights under Section 1981 by, among other things: (a) refusing to allow the Floyds to be members of the CMCA; (b) calling the police to report the Floyds each time the Floyds held a private social gathering at their Accokeek Residence; (c) referring to the Floyds as "criminals" and disparaging them in communications with other residents of the community; (d) claiming that the Floyds were engaging in unlawful activity at their Accokeek Residence in communications with third parties, including other residents in the community; and (e) conspiring with one or more of the other CMCA Defendants and representatives of DPIE and the PGCPD to target the Floyds with unjustified law enforcement and code enforcement actions.

141.    Defendant D. Wallace's conduct was premised on the Floyds' race. Defendant D. Wallace acted intentionally, and with malice, in interfering with the Floyds' rights under Section 1981.

142.    Defendant Femia engaged in conduct that interfered with the Floyds' rights under Section 1981 by, among other things: (a) refusing to allow the Floyds to be member of the CMCA; (b) calling the police to report the Floyds each time the Floyds held a private social gathering at their Accokeek Residence; (c) referring to the Floyds as "criminals" and disparaging them in communications with third parties, including other residents in the community; (d) claiming that the Floyds were engaging in unlawful activity at their Accokeek Residence in communications with third parties; (e) making false statements about the Floyds or activities related to their use and enjoyment of their Accokeek Residence in communications with third parties, including the PGCPD and DPIE; (f) attempting to interfere with the Floyds' right to list their home for rent on Airbnb; and (g) conspiring with one or more of the other CMCA Defendants and representatives of DPIE and the PGCPD to target the Floyds with unjustified law enforcement and code enforcement actions.

143.    Defendant Femia's conduct was premised on the Floyds' race. Defendant Femia acted intentionally, and with malice, in interfering with the Floyds' rights under Section 1981.

144.    Defendant Klink engaged in conduct that interfered with the Floyds' rights under Section 1981 by, among other things: (a) refusing to allow the Floyds to be members of the CMCA; (b) calling the police to report the Floyds each time the Floyds held a private social gathering at their Accokeek Residence; (c) referring to the Floyds as "criminals" and disparaging them in communications with other residents of the community; (d) claiming that the Floyds were engaging in unlawful activity at their Accokeek Residence in communications with third

parties, including other residents in the community; and (e) conspiring with one or more of the other CMCA Defendants and representatives of DPIE and the PGCPD to target the Floyds with unjustified enforcement actions.

145.    Defendant Klink's conduct was premised on the Floyds' race. Defendant Klink acted intentionally, and with malice, in interfering with the Floyds' rights under Section 1981.

146.    Defendant Cassidy engaged in conduct that interfered with the Floyds' rights under Section 1981 by, among other things: (a) calling the police to report the Floyds each time the Floyds held a private social gathering at their Accokeek Residence; (b) attempting to persuade Representative Hoyer to take legislative action against the Floyds; (c) submitting false or misleading complaints about the Floyds to Airbnb; (d) leveraging his political connections and influence to target the Floyds with unjustified enforcement actions; and (e) conspiring with one or more of the other CMCA Defendants and representatives of DPIE and the PGCPD to target the Floyds with unjustified law enforcement and code enforcement actions.

147.    Defendant Cassidy's conduct was premised on the Floyds' race. Defendant Cassidy acted intentionally, and with malice, in interfering with the Floyds' rights under Section 1981.

148.    Defendant Rannacher engaged in conduct that interfered with the Floyds' rights under Section 1981 by, among other things: (a) targeting the Floyds with increased police surveillance based solely on verbal complaints received by the CMCA Defendants; (b) commencing proceedings before the NAB against the Floyds based on two discrete incidents that occurred on February 26, 2023 and June 10, 2023, without properly complying with the Nuisance Code; (c) falsely claiming in the Summary of Nuisance Complaint filed with the NAB that more than one party notification letter was issued to the Floyds; (d) failing to subject the

White residents who hosted private social gatherings at their residences with the same level of law enforcement scrutiny that was applied to the Floyds; and conspiring with one or more of the CMCA Defendants to target the Floyds with unjustified law enforcement and code enforcement actions.

149.    Defendant Rannacher's conduct was premised on the Floyds' race. Defendant Rannacher acted intentionally, and with malice, in interfering with the Floyds' rights under Section 1981.

150.    The NAB, together with the actions of representatives from DPIE and the PGCPD, and in conformity with the official policies and customs of Defendant PGC, engaged in conduct that interfered with the Floyds' rights under Section 1981 by, among other things: (a) improperly imposing fines against the Floyds under the Nuisance Code based upon two discrete incidents that occurred on February 26, 2023 and June 10, 2023; (b) failing to comply with the Nuisance Code requirement that at least one affidavit accompany a complaint or petition prior to subjecting the Floyds to proceedings before the NAB; (c) blindly serving as a partial and biased extension of the PGCPD and DPIE when reviewing and adjudicating the Summary of Nuisance Complaint submitted against the Floyds.

151.    The wrongful conduct on the part of the Defendants unreasonably interfered with the Floyds' right to enjoy the contractual benefits of property ownership and peaceable living on an equal basis to that of the White residents in the community.

152.    As a result of the wrongful actions taken by the Defendants, the Floyds have suffered and continue to suffer substantial harm.

<u>**COUNT II**</u>
**Violation of Section 1982 of the Civil Rights Act of 1866, 42 U.S.C. § 1982,**
**By Defendants**

153.     The Floyds incorporates herein the allegations set forth in paragraphs 9 through 132, above.

154.     Section 1982 guarantees that "[a]ll citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property."

155.     The Floyds are members of a protected class under 42 U.S.C. § 1982 based on their status as African Americans.

156.     At the time the CMCA Defendants engaged in the conduct at issue, each of the CMCA Defendants knew that the Floyds were Black or African American, or that the Floyds otherwise belonged to a racial minority group.

157.     Defendant R. Wallace engaged in conduct that interfered with the Floyds' right to hold real property on an equal basis with that of the White residents in the Calvert Manor community, in violation of Section 1982, by, among other things: (a) persistently entering onto the Floyds' Accokeek Residence without permission to threaten or intimidate the Floyds; (b) calling the police to report the Floyds each time the Floyds held a private social gathering at their Accokeek Residence; (c) referring to the Floyds as "criminals" and disparaging them in communications with third parties, including other residents in the community; (d) claiming that the Floyds were engaging in unlawful activity at their Accokeek Residence in communications with third parties; and (e) conspiring with one or more representatives of DPIE and the PGCPD to target the Floyds with unjustified enforcement actions.

158.     Defendant R. Wallace's conduct was premised on the Floyds' race. Defendant R. Wallace acted intentionally, and with malice, in interfering with the Floyds' rights under Section 1982.

159.     Defendant D. Wallace engaged in conduct that interfered with the Floyds' right to hold real property on an equal basis with that of the White residents in the Calvert Manor community, in violation of Section 1982, by, among other things: (a) refusing to allow the Floyds to be members of the CMCA; (b) calling the police to report the Floyds each time the Floyds held a private social gathering at their Accokeek Residence; (c) referring to the Floyds as "criminals" and disparaging them in communications with other residents of the community; (d) claiming that the Floyds were engaging in unlawful activity at their Accokeek Residence in communications with third parties, including other residents in the community; and (e) conspiring with one or more representatives of DPIE and the PGCPD to target the Floyds with unjustified enforcement actions.

160.     Defendant D. Wallace's conduct was premised on the Floyds' race. Defendant D. Wallace acted intentionally, and with malice, in interfering with the Floyds' rights under Section 1982.

161.     Defendant Femia engaged in conduct that interfered with the Floyds' right to hold real property on an equal basis with that of the White residents in the Calvert Manor community, in violation of Section 1982, by, among other things: (a) refusing to allow the Floyds to be member of the CMCA; (b) calling the police to report the Floyds each time the Floyds held a private social gathering at their Accokeek Residence; (c) referring to the Floyds as "criminals" and disparaging them in communications with third parties, including other residents in the community; (d) claiming that the Floyds were engaging in unlawful activity at their Accokeek

Residence in communications with third parties; (e) making false statements about the Floyds or activities related to their use and enjoyment of their Accokeek Residence in communications with third parties, including the PGCPD and DPIE; (f) attempting to interfere with the Floyds' right to list their home for rent on Airbnb; and (g) conspiring with one or more representatives of DPIE and the PGCPD to target the Floyds with unjustified enforcement actions.

162.    Defendant Femia's conduct was premised on the Floyds' race. Defendant Femia acted intentionally, and with malice, in interfering with the Floyds' rights under Section 1982.

163.    Defendant Klink engaged in conduct that interfered with the Floyds' right to hold real property on an equal basis with that of the White residents in the Calvert Manor community, in violation of Section 1982, by, among other things: (a) refusing to allow the Floyds to be members of the CMCA; (b) calling the police to report the Floyds each time the Floyds held a private social gathering at their Accokeek Residence; (c) referring to the Floyds as "criminals" and disparaging them in communications with other residents of the community; (d) claiming that the Floyds were engaging in unlawful activity at their Accokeek Residence in communications with third parties, including other residents in the community; and (e) conspiring with one or more of the other CMCA Defendants and representatives of DPIE and the PGCPD to target the Floyds with unjustified enforcement actions.

164.    Defendant Klink's conduct was premised on the Floyds' race. Defendant Klink acted intentionally, and with malice, in interfering with the Floyds' rights under Section 1982.

165.    Defendant Cassidy engaged in conduct that interfered with the Floyds' right to hold real property on an equal basis with that of the White residents in the Calvert Manor community, in violation of Section 1982, by, among other things: (a) calling the police to report the Floyds each time the Floyds held a private social gathering at their Accokeek Residence; (b)

attempting to persuade Representative Hoyer to take legislative action against the Floyds; and (c) attempting to interfere with the Floyds' right to list their home for rent on Airbnb.

166.    Defendant Cassidy's conduct was premised on the Floyds' race. Defendant Cassidy acted intentionally, and with malice, in interfering with the Floyds' rights under Section 1982.

167.    Defendant Rannacher engaged in conduct that interfered with the Floyds' right to hold real property on an equal basis with that of the White residents in the Calvert Manor community, in violation of Section 1982, by, among other things: (a) targeting the Floyds with increased police surveillance based solely on verbal complaints received by the CMCA Defendants; (b) commencing proceedings before the NAB against the Floyds based on two discrete incidents that occurred on February 26, 2023 and June 10, 2023, without properly complying with the Nuisance Code; (c) falsely claiming in the Summary of Nuisance Complaint filed with the NAB that more than one party notification letter was issued to the Floyds; and (d) failing to subject the White residents who hosted private social gatherings at their residences with the same level of law enforcement scrutiny that was applied to the Floyds.

168.    Defendant Rannacher's conduct was premised on the Floyds' race. Defendant Rannacher acted intentionally, and with malice, in interfering with the Floyds' rights under Section 1982.

169.    The NAB, together with the actions of representatives from DPIE and the PGCPD, and in conformity with the official policies and customs of Defendant PGC, engaged in conduct that interfered with the Floyds' right to hold real property on an equal basis with that of the White residents in the Calvert Manor community, in violation of Section 1982, by, among other things: (a) improperly imposing fines against the Floyds under the Nuisance Code based

upon two discrete incidents that occurred on February 26, 2023 and June 10, 2023; (b) failing to comply with the Nuisance Code requirement that at least one affidavit accompany a complaint or petition prior to subjecting the Floyds to proceedings before the NAB; (c) blindly serving as a partial and biased extension of the PGCPD and DPIE when reviewing and adjudicating the Summary of Nuisance Complaint submitted against the Floyds.

170.    The wrongful conduct on the part of the Defendants unreasonably interfered with the Floyds' right of access to, or enjoyment of, recreational facilities associated with the Accokeek Residence. The Floyds were: (a) denied membership in the CMCA, which include certain amenities that are readily available to the White residents of the Calvert Manor neighborhood; (b) subjected to baseless fines or citations for minor or fabricated violations, making it extremely difficult for the Floyds to maintain their property on par with others in the community; (c) subjected to actions that hindered their ability to access and enjoy their Accokeek Residence on equal terms to that of the White residents in the community; (d) subjected to ongoing harassment, racially-motivated threats, and hostile behavior from Defendants R. Wallace, D. Wallace, Femia, Cassidy, and other members of the CMCA, which the CMCA Board failed to address or otherwise condoned; (e) excluded from participating in community decision-making processes on the same basis as White residents in the community; and (f) subjected to wrongful code enforcement actions that impeded their use of the Accokeek Residence in ways not experienced by White residents in the community.

171.    As a result of the Defendants' wrongful conduct, the Floyds suffered and continue to suffer substantial harm.

## COUNT III
**Violation of Fourteenth Amendment' Equal Protection Clause under 42 U.S.C. § 1983,
By Defendants Rannacher and Prince George's County**

172.     The Floyds incorporate herein the allegations set forth in paragraphs 9 through 132, above.

173.     The Fourteenth Amendment's Equal Protection Clause prohibits a State from denying "any person within its jurisdiction the equal protection of the laws."

174.     While acting under color of state law, Defendant Rannacher singled-out the Floyds in the law enforcement process and deprived them of equal protection under the law. Defendant Rannacher subjected the Floyds to heightened surveillance through the deployment of a "Party Squad" and increased law enforcement actions, yet Defendant Rannacher did not subject any of the other residents within the Calvert Manor neighborhood to such actions, despite similar complaints made by the Floyds. The Floyds' racial identity is the only meaningful difference between them and the other residents of the Calvert Manor neighborhood.

175.     Defendant Rannacher acted intentionally in depriving the Floyds of their right to equal treatment under the law.

176.     Defendant Rannacher's actions reflect a deliberate indifference to the Floyds' right to equal protection under the law and their right to access and use the Accokeek Residence on an equal footing with that of the White residents in the Calvert Manor neighborhood.

177.     A local government or municipality is liable under 42 U.S.C. § 1983 for a violation of the Fourteenth Amendment's Equal Protection Clause that occurs pursuant to an official policy or custom.

178.     The PGCPD is responsible for adequately training and supervising its police officers to ensure they are not selectively enforcing the law based on prohibited considerations such as race.

179.    The PGCPD is responsible for adequately training and supervising its police officers to ensure that they carry out their duties in an objective manner, treating all similarly situated residents of the County equally under the law.

180.    Based on Defendant Rannacher's conduct, it is reasonable to infer that PGCPD failed to adequately train or supervise its officers in performing some minimum level of due diligence prior to adding a residence to the PGCPD's "Party Squad" surveillance list.

181.    Based on Defendant Rannacher's conduct, it is reasonable to infer that PGCPD failed to adequately train or supervise its officers in establishing protocols for responding to situations involving disputes between individuals of different races and ethnic backgrounds, particularly in recognizing disputes that may be racially-motivated.

182.    The deficiencies in PGCPD's training and supervision reflect a deliberate indifference to the federally protected rights of individuals like the Floyds, leading to a predictable pattern of law enforcement actions that treat White individuals more favorably than Black individuals under the law.

183.    The unequal treatment experienced by the Floyds, and the harm that flowed therefrom, was caused, at least in part, by PGCPD's failure to train or supervise its officer, including Defendant Rannacher.

184.    As a result of Defendant Rannacher's conduct, in conformity with the policies and customs of Defendant PGC, the Floyds suffered and continue to suffer substantial harm.

## <u>COUNT IV</u>
**Violation of Article 24 of the Maryland Declaration of Rights by Defendant Rannacher**

185.    The Floyds incorporates herein the allegations set forth in paragraphs 9 through 132, above.

186.     Article 24 of the Maryland Declaration of Rights affords the Floyds the same rights and protections as those guaranteed to him under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

187.     Defendant Rannacher's conduct, referenced in paragraphs 148 and 167, deprived the Floyds of their constitutional rights under Article 24 of the Maryland Declaration of Rights.

188.     As a result of Defendant Rannacher's wrongful conduct, the Floyds suffered and continue to suffer substantial harm.

### COUNT V
### Violation of Section 1985 of the Ku Klux Klan Act of 1871, 42 U.S.C. § 1985, By Defendants

189.     The Floyds incorporate herein the allegations set forth in paragraphs 9 through 132, above.

190.     Section 1985 of the Ku Klux Klan Act of 1871 (commonly referred to as the Civil Rights Act of 1871) makes it unlawful for two or more people to conspire to deprive a person of equal protection under the law.

191.     The Floyds are members of a protected class under Section 1985(3) based on their status as African Americans.

192.     At the time the Defendants engaged in the conduct at issue, each of the Defendants knew that the Floyds were Black or African American, or that the Floyds otherwise belonged to a racial minority group.

193.     The CMCA Defendants conspired with each other and Defendant Rannacher to intimidate, harass, and target the Floyds with law enforcement actions in a manner that deprived them of their rights under 42 U.S.C. §§ 1981 and 1982.

194.    The CMCA Defendants and Defendant Rannacher engaged in several overt acts in furtherance of the conspiracy, including the persistent submission of baseless police complaints against the Floyds, resulting in over 50 police visits to the Floyds' property between June 2020 and June 2023. Despite the high volume of complaints, no citations or arrests were made, indicating the frivolous nature of the complaints and the intent to harass the Floyds based on their race.

195.    On June 23, 2021, Defendant Femia, acting in furtherance of the conspiracy, falsely reported "illegal parking" at the Floyds' residence to the PGCPD, leading to increased police scrutiny and harassment.

196.    Defendant Femia further requested assistance from Defendant Rannacher to address her "issues" with the Floyds, as evidenced by her communication on July 5, 2021. In response to these coordinated complaints, Defendant Rannacher advised Femia and other CMCA Defendants to call the County's non-emergency number to report any gatherings at the Floyds' residence. Defendant Rannacher's broad sweeping instructions reflect a deliberate indifference to the Floyds' rights to use and enjoy their property on an equal basis with that of the other residents in the Calvert Manor neighborhood.

197.    On August 3, 2021, Defendant Femia, acting in furtherance of the conspiracy, falsely claimed to Defendant Rannacher that a flyer advertising a party at the Floyds' residence was causing disturbances, despite having no evidence linking the Floyds to the flyer. Without speaking with the Floyds, Defendant Rannacher escalated Defendant Femia's complaint by deploying a "Party Squad" to monitor the Floyds' residence and by involving the Nuisance Abatement Board.

198.     The deployment of a "Party Squad" to monitor the Floyds' property, as referenced in paragraph 40, and the NAB's issuance of a summons based on unfounded complaints, demonstrate targeted and coordinated law enforcement actions designed to intimidate and harass the Floyds because of their race.

199.     The NAB hearing held on October 19, 2023, based on the nuisance complaint submitted by Defendant D. Wallace and supported by statements provided by Defendant Femia, was a further manifestation of the conspiracy. The hearing, influenced by the coordinated actions and false testimonies of the CMCA Defendants and Defendant Rannacher, resulted in unjustified findings against the Floyds and a punitive decision and order from the NAB. The findings of fact from the NAB's decision were broad and vague, suggesting the process was influenced by the coordinated efforts by the CMCA Defendants and Defendant Rannacher.

200.     The Defendants' actions reflect a deliberate and malicious intent to deny the Floyds the equal protection of the laws and the equal privileges and immunities under the laws, solely based on their race.

201.     As a result of the Defendants' conspiracy, the Floyds suffered and continue to suffer substantial harm.

**COUNT VI**
**Private Nuisance by the CMCA Defendants**

202.     The Floyds incorporates herein the allegations set forth in paragraphs 9 through 132, above.

203.     The CMCA Defendants, acting individually and in concert, have engaged in a pattern of conduct intended to interfere with the Floyds' use and enjoyment of their Accokeek Residence. The actions taken by the CMCA Defendants did interfere with the Floyds' use and enjoyment of their Accokeek Residence.

204.    Each of the CMCA Defendants have publicly disparaged the Floyds, referring to them as "criminals" and falsely claiming that they were "destroying the fabric" of the Calvert Manor neighborhood. Such statements were made with the intent to ostracize the Floyds and create a hostile living environment for them, thereby interfering with their ability to peacefully enjoy their property.

205.    Defendants caused "no parking" signs to be installed along the Floyds' property line, which were not initially placed elsewhere in the neighborhood. This targeted action was intended to create inconvenience and restrict the Floyds' use of their property.

206.    The CMCA Defendants engaged in a pattern of leveraging the police to harass and intimidate the Floyds. For instance, on multiple occasions, each of the CMCA Defendants called the police to report gatherings at the Floyds' residence, while allowing White residents to host private social gatherings at their respective residences without interference. This selective enforcement was racially motivated and intended to disrupt the Floyds' peaceful enjoyment of their home.

207.    Defendant Femia, acting in concert with the other CMCA Defendants, sent multiple emails to Defendant Rannacher that alleged false or misleading complaints about noise, parking, and supposed disturbances caused by the Floyds. These actions were designed to provoke unwarranted police responses and create a hostile living environment for the Floyds. Defendant Femia's actions did subject the Floyds to unwarranted police responses and a hostile living environment in the Calvert Manor neighborhood.

208.    Defendants' conduct has resulted in a significant and unreasonable interference with the Floyds' use and enjoyment of their property. The frequent police visits, public

disparagement, and installation of "no parking" signs have caused the Floyds substantial emotional distress, embarrassment, and inconvenience.

209.    The actions taken by the CMCA Defendants were intentional, malicious, and carried out with the knowledge that such conduct would interfere with the Floyds' ability to enjoy their property.

210.    As a result of Defendants' actions, the Floyds have suffered and continue to suffer substantial harm.

<u>**COUNT VII**</u>
**Trespass by Defendant R. Wallace**

211.    The Floyds incorporate herein the allegations set forth in paragraphs 9 through 132, above.

212.    Defendant R. Wallace, on multiple occasions in 2021, 2022, and 2023, as referenced in paragraph 45, willfully and intentionally entered onto the Floyds' property without their permission or consent.

213.    Defendant R. Wallace's entries onto the Floyds' property were made despite clear warnings and requests from the Floyds for him not to trespass on their property.

214.    Defendant R. Wallace's acted intentionally, and with malice, in entering onto the Floyds' property without permission, knowing that his conduct was unauthorized and in violation of the Floyds' property rights.

215.    Each time Defendant R. Wallace entered upon the Floyds' property, he engaged in conduct that was intended to intimidate or disparage Mr. Floyd.

216.    The repeated trespasses by Defendant R. Wallace interfered with the Floyds' possession and use of their property, causing them significant distress and discomfort.

217.     As a direct and proximate result of Defendant R. Wallace's trespasses, the Floyds have suffered damages, including but not limited to emotional distress arising out of fear for their safety and the feeling of insecurity in their own home.

### COUNT VIII
**Defamation by Defendants R. Wallace, D. Wallace, Klink, and Femia**

218.     The Floyds incorporate herein the allegations set forth in paragraphs 9 through 132, above.

219.     On multiple occasions, Defendants R. Wallace, D. Wallace, Klink, and Femia publicly referred to the Floyds as "criminals" in communications with third parties. The statement falsely imputed criminal behavior and misconduct to the Floyds, and there was no factual basis for such claims.

220.     The statements made by Defendants R. Wallace, D. Wallace, Klink, and Femia were false. Each of these defendants knew or should have known that the statements were false.

221.     Defendants R. Wallace, D. Wallace, Klink, and Femia made the statements with the intent to harm the Floyds' reputation and standing within the community.

222.     The false and defamatory statements made by Defendants R. Wallace, D. Wallace, Klink, and Femia have caused significant harm to the Floyds' reputation, subjecting them to public ridicule, contempt, and ostracism within their community.

223.     As a result of the wrongful actions taken by Defendants R. Wallace, D. Wallace, Klink, and Femia, the Floyds have suffered and continue to suffer substantial harm.

### COUNT IX
**Conspiracy to Interfere with Business Relationships by CMCA Defendants**

224.     The Floyds incorporate herein the allegations set forth in paragraphs 9 through 132, above.

225.    The Floyds had a contractual relationship with Airbnb in 2023.

226.    Each of the CMCA Defendants had knowledge of the Floyds' existing contractual relationship with Airbnb because they each reviewed the Floyds' property listing that was published to the company's website and/or app.

227.    Despite having knowledge of the existence of the contractual relationship that existed between the Floyds and Airbnb, the CMCA Defendants conspired to interfere with the contractual relationship by submitting a false or misleading complaint to Airbnb regarding the advertisement of a party that was not associated with the Floyds, as referenced in paragraphs 79 through 83.

228.    The CMCA Defendants intended to cause harm to the Floyds by sending the complaint to Airbnb.

229.    As result of the wrongful conduct on the part of the CMCA Defendants, the Floyds suffered economic harm.

## COUNT X
### Violation of Fair Housing Act, 42 U.S.C. §§ 3601-3619, by Defendants CMCA, D. Wallace, and Klink

230.    The Floyds incorporate herein the allegations set forth in paragraphs 9 through 132, above.

231.    Section 3604(b) of the Fair Housing Act prohibits, among other things, discrimination "in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race . . . ."

232.    Defendants CMCA, D. Wallace, and Klink engaged in discriminatory practices that interfered with the Floyds' right to use and enjoy their property on an equal basis with other residents.

233.     The actions taken by Defendants CMCA, D. Wallace, and Klink were motivated by the Floyds' race and were intended to deprive them of the benefits and privileges of homeownership, including the benefits and privileges that come with being members of the Calvert Manor Civic Association.

234.     As result of wrongful conduct on the part of Defendants CMCA, D. Wallace, and Klink, the Floyds have suffered and continue to suffer substantial harm.

### COUNT XI
### Intentional Infliction of Emotional Distress by the CMCA Defendants

235.     The Floyds incorporate herein the allegations set forth in paragraphs 9 through 132, above.

236.     Each of the CMCA Defendants has engaged in extreme and outrageous conduct by persistently harassing, intimidating, and defaming the Floyds, or otherwise causing the Floyds to be harassed and intimidated by law enforcement actions.

237.     The conduct on the part of each CMCA Defendant was intended to cause, or was performed with reckless disregard of the probability of causing, the Floyds severe emotional distress.

238.     As a result of the CMCA Defendants' conduct, the Floyds have suffered and continue to suffer severe emotional distress, including anxiety, fear, and insecurity in their own home.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Angela Floyd and Prince Floyd respectfully request that the Court enter judgment on the Complaint, in their favor and against Defendants Prince George's County, Calvert Manor Civic Association, Richard Wallace, Diane Wallace, Maria Femia, Marianne Klink, Thomas Cassidy, and Stephen Rannacher, as follows:

A.      Declare that the Floyds are qualified to be members of the CMCA and that the CMCA must afford the Floyds the opportunity to become members of the CMCA;

B.      Award the Floyds compensatory damages for the harm they suffered as a result of Defendants' conduct, in fair and reasonable amount to be determined at trial;

C.      Award the Floyds punitive damages against Defendants CMCA, R. Wallace, D. Wallace, Femia, Klink, Cassidy, and Rannacher, in an amount that sufficiently punishes, penalizes, and/or deters their unlawful conduct;

D.      Award the Floyds pre-judgment interest and post-judgment interest;

E.      Award the Floyds the costs and fees they incurred in connection with this action, including reasonable attorneys' fees;

F.      Permanently enjoin Defendant CMCA from publishing disparaging statements about the Floyds or their guests in newsletters, emails, or other communications disseminated by Defendant CMCA; and

G.      Grant the Floyds such other relief as the Court deems just and proper, including additional injunctive and declaratory relief as may be required in the interest of justice.

Dated: June 19, 2024

*/s/ Jordan D. Howlette*
JORDAN D. HOWLETTE
D. Md. Bar No.: 21634
Managing Attorney
JD Howlette Law
1140 3rd St. NE
Washington, DC 20002
Tel: (202) 921-6005
Fax: (202) 921-7102
jordan@jdhowlettelaw.com
*Counsel for Plaintiffs*
